## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

GARRETT DEWYSE,
    Plaintiff,

    v.

WILLIAM L. FEDERSPIEL, et al
    Defendants

_____/

Case No.: 17-10044
Honorable Judith E. Levy

**RESPONSE / BRIEF**

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Co-Counsel for Plaintiff
PO Box 107
Hemlock, MI 48626
(989) 642-0055
(888) 398-7003 - fax
pellison@olcplc.com

MATTHEW E. GRONDA (P73693)
Co-Counsel for Plaintiff
PO Box 70
St. Charles, MI 48655
(989) 249-0350
matthewgronda@gmail.com

TIMOTHY S. FERRAND (P39583)
CUMMINGS, MCCLOREY, DAVIS
& ACHO, PLC
Attorney for Defendants
19176 Hall Road, Suite 220
Clinton Township, MI 48038
(586) 228-5600
tferrand@cmda-law.com

---

## RESPONSE AND BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## QUESTION PRESENTED

Are Defendants entitled to summary judgment in whole?

**Answer:**
No

# MOST RELEVANT AUTHORITY

FRCP 56

*Lane v. Franks*, 573 U.S. 228 (2014)

**BRIEF IN OPPOSITION**

Deputy Garrett DeWyse began his career with the Saginaw County Sheriff's Office in 2005. **Exhibit A**. A career in law enforcement was not just a job opportunity for Deputy DeWyse, but a lifelong aspiration. **Exhibit B**. And it showed; throughout his career Deputy DeWyse's performance objectively evidenced a passion for both profession and community. See, for example **Exhibit C** (Sheriff Federspiel formally commending DeWyse for a moving musical performance on bagpipes at the departmental awards ceremony) and **Exhibit D** (a community member writing to Sheriff Federspiel to inform him that Deputy DeWyse went far above the call of duty in protecting a child separated from parents).

Because of his integrity and commitment, Deputy DeWyse was promoted to an administrative role in late 2011 as manager of the Sheriff's evidence and property room. **Exhibit E**; **Exhibit F**, pages 94-95. During his off-duty time, Deputy DeWyse had advanced his education earning both an associate degree and bachelor's degree in administration and finance. **Exhibit F**, pages 31-32. This education, coupled with his personal qualities and ethics, made him uniquely qualified for this special position. It was not surprising that he continued to exceed expectations. **Exhibit G**.

Deputy DeWyse's high ethics first began creating problems for the Sheriff, and in return for him, in 2014. On February 27, 2014, Detective John Butcher of the Saginaw County Sheriff's Office brought $22,583 in cash along with several firearms to the property room. **Exhibit H**. On March 19, 2014, Detective Butcher approached Deputy DeWyse and requested that $2,000 be temporarily removed from the sealed evidence bag containing the $22,583. **Exhibit B**. Detective Butcher explained that the money was to be used for paying confidential informants and funding controlled-substance buys. **Exhibit B**; **Exhibit I**, page 315. As the deputy responsible for the integrity and reliability of evidence in addition to accounting for its chain of custody, Deputy DeWyse refused the request. **Exhibit B**.

To step briefly back, and unbeknownst to Deputy DeWyse at the time, the circumstances leading to the seizure of the cash and guns were dubious at best and criminal at worst. On February 27, 2014, Detective Butcher was operating out of the department's jurisdiction in Genesee County and came into contact with a Pierre Najjar who apparently was suspected of illegal controlled substance activity. **Exhibit H**. Instead of arresting Mr. Najjar, Detective Butcher offered him a deal. *Id.* If Najjar was willing to hand over his guns and cash ($22,583), Detective Butcher would let him walk and the matter would not be reported to the local prosecuting attorney. *Id.* Najjar,

-2-

unsurprisingly, agreed.[1] *Id.* The reason for this arguable act of extortion, however, would not be clear to Deputy DeWyse for almost two years.[2]

Going back to March 19, and within minutes of Detective Butcher being refused $2,000 from the sealed evidence bag, Lieutenant Randy Pfau ordered Deputy DeWyse to appear his office. **Exhibit B**; **Exhibit I**, page 317**.** Deputy DeWyse complied and upon arriving in Pfau's office also observed Detective Butcher present. *Id.* Lieutenant Pfau explained to Deputy DeWyse that the Sheriff's Office had an immediate need for cash to fund an undercover operation and that the evidence bag containing the $22,583 was the only option. **Exhibit B**; **Exhibit I**, page 320. Despite this explanation, Deputy DeWyse persisted in his objection, which was overruled by an order from Lieutenant Pfau to release the funds to Detective Butcher. **Exhibit B**. He complied with the order as required. *Id.* Little did Deputy DeWyse know then, Sheriff Federspiel had already issued the order to use the Najjar money contrary to state law. **Exhibit K**, at 33:50 – 36:60 (available at https://youtu.be/mjS6KVRfEac).

---

[1] Contrary to the defendants' suggestion in page 11 of their brief, Pierre Najjar never acted as a confidential informant.

[2] MCL 750.213 states that "any person who shall … maliciously threaten to accuse another of any crime or offense … [or] threaten any injury to the person or property … with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony."

Detective Butcher's removal of the $2,000 was anything but a one-time occurrence. Over the course of the next year, Detective Butcher returned repeatedly to the property room and removed cash from the evidence bag until the entirety of it had been removed. Upon each removal, Deputy DeWyse required Detective Butcher to record and sign a handwritten "chit" sheet which was left in the now-compromised evidence bag. **Exhibit J**. Furthermore, Deputy DeWyse continued to unsuccessfully object to what he believed to be an improper practice. **Exhibit B**; **Exhibit K**, at 3:50 – 5:00 (available at https://youtu.be/mjS6KVRfEac).

The defendants are correct in their brief; Deputy DeWyse was informed that he would be picking up roadkill in 2014 in addition to his duties in the evidence room. **Df's Brief**, page 7. This duty was "assigned" to him just shortly after he began vocally objecting to Lieutenant Pfau and Detective Butcher's removal of cash from the evidence room. **Exhibit B**. No administrative deputy assigned to the property room had ever been assigned such a task; and in particular no college educated deputy on the path to command. **Exhibit B**. Roadkill duty, as the name suggests, entails picking up dead rotting animals within Saginaw County and loading them into a trailer. Suffice to say, it is demeaning, smelly, dirty, and unhealthy work (albeit politically expedient for the Sheriff). **Exhibit M**, page 29. While it does

-4-

not require much of a speculative jump to conclude that he was being punished, no such speculation is necessary here.

At a meeting of the entire Sheriff's Office staff, Sheriff Federspiel specifically called out Deputy DeWyse's prior reporting of illegal activities—

> We have put our squabbles aside. Whatever you decide you want to do off duty, I don't care but you can't fly two flags or serve two masters; it won't work. And if you want to take a shot at this agency publicly, I won't stand for it. I won't stand for anyone in this agency you accuse other members of this agency of anything, let alone theft or misappropriation of funds or other things that may be important to some of you. You know, because you know the news media's calling me already. Hey Sheriff, we got a FOIA request for a particular case number already. Where'd you get the case number Terry Camp[3]; I can't divulge that. Oh, what it's about Terry Camp? Out its about misappropriation of $23,000. That's going to be the big question of the day.

**Exhibit L**, at 36:02 – 37:08 (available at https://youtu.be/UqpKmtZsiFU). And then later in that same meeting, the Sheriff further demeaned DeWyse in front of the entire department:

> Garrett, how many dead animals have you picked up in the last few years? Too many to count, right? But you know what people call me all the time and say thanks for having somebody pick up that skunk; it was pretty crummy.

*Id.* at 01:48:00 – 01:48:15 (available at https://youtu.be/UqpKmtZsiFU).

---

[3] Terry Camp is a local, long time investigative journalist/reporter from ABC12 and is often a political thorn in the side of Sheriff Federspiel. See https://www.abc12.com/content/bios/443289743.html

It was until early 2016 that Mr. DeWyse fully understood what was happening. In January 2016, DeWyse for the first time was ordered to compile information for a mandatory annual report to the State of Michigan concerning civil forfeiture activities during calendar year 2015. **Exhibit B**; **Exhibit K**, at 3:50 – 5:00 (available at https://youtu.be/mjS6KVRfEac). This was never part of his ordinary job duties. **Exhibit B, ¶12**; see also **Exhibit I**, page 330. During the process of preparing that report, Deputy DeWyse became highly concerned when he recognized that the now spent $22,583 would not be reflected in annual report. **Exhibit B**. Digging in the matter more on his own, he further came to understand that the actions of Lieutenant Pfau and Detective Butcher were not just bad police work, but also illegal. **Exhibit B**. Michigan Compiled Law 333.7521 et seq, which authorizes civil asset forfeiture, clearly commands that "any money … that [is] forfeited under this article shall be deposited with the treasurer of the entity having budgetary authority over the seizing agency." In this case, that meant that the $22,583 needed to be deposited with the Saginaw County Treasurer for proper accounting and allocation and not kept off the books in the Sheriff's possession.

Justifiably fearing that he was party to a misappropriation of civil forfeiture assets, Deputy DeWyse met with a representative of the Saginaw

County Controller and explained what had occurred with the $22,538. As he clearly remembers, upon hearing his disclosure that representative simply said: "oh my." **Exhibit I**, pages 392-393. At this same time, Deputy DeWyse was seriously demoted from the position of administrative deputy to juvenile courthouse guard. And unsurprisingly, roadkill duty followed him.

To make matters even worse, the Sheriff's Office initiated an internal investigation into Deputy DeWyse's disclosure to the Saginaw County Controllers Office. **Exhibit N**. This process culminated with a June 1, 2016 personal meeting between Sherriff Federspiel and Deputy DeWyse. At that meeting, the Sheriff informed DeWyse that he would be issuing a formal reprimand to Deputy DeWyse's personnel file but that no further punishment would be imposed.[4] **Exhibit K**, starting at 11:48 (available at https://youtu.be/mjS6KVRfEac). The Sheriff explained – and lied - that Deputy DeWyse's demotion was simply a matter of seniority and that a former and more senior property room administrative deputy (Charles Wehner) had "bumped" him out of the position. **Exhibit K**, at 13:40 – 15:00 (available at https://youtu.be/mjS6KVRfEac). Although the Court is encouraged to listen to the entirety of the meeting, one further point of

---

[4] Deputy DeWyse, now even more fearful of both legal and professional reprisals, secretly recorded the meeting.

discussion must be mentioned. Sheriff Federspiel confirmed Deputy DeWyse's fear that the off-the-books removal was at the Sheriff's own direction for the purpose of hiding the asset from the Saginaw County Controller. The Sheriff explained that he strongly disagreed with how the Saginaw County Controller and Board of Commissioners was allocating forfeiture proceeds and went so far as to say that the Controller was stealing from him. In his own words:

- "What I do with my forfeiture money is my business. It's not their business [meaning the Saginaw County Controller]."

- "They [Saginaw County officials] should never touch my forfeiture money."

- "It's not right what they do with it."

**Exhibit K**, beginning at 26:30 (available at https://youtu.be/mjS6KVRfEac). Federspiel further admitted that he ordered deputies to not deliver forfeiture money to the Saginaw County Controller. He stated that, because of his disagreement with how the Saginaw County Controller is allocating civil forfeiture proceeds, that he is "going to work around it" because if he deposited money with the Treasurer that he "feels that he will never see it again. *Id.*, beginning at 33:45.

As mentioned above, Sheriff Federspiel lied that Deputy DeWyse's demotion to courthouse guard – with roadkill duty following – was simply the

result of the former and more senior property deputy's request to transfer. See **Exhibit K**, at 13:40 – 15:00 (available at https://youtu.be/ mjS6KVRfEac). That deputy, Charles Wehner, was deposed in this litigation. As a background, Wehner served as the property room deputy for 8 years prior to Deputy DeWyse taking over. **Exhibit M**, page 20. Wehner, who had requested a voluntary transfer to road duty for career advancement purposes, had trained Deputy DeWyse. *Id.* at 18. In his testimony, Deputy Wehner directly contradicted the Sheriff and indicated they he *never* requested to "bump" Deputy DeWyse from the property room position. *Id.* Instead, Sheriff Federspiel *called him* – which was the one and only time they had ever spoken on the phone – and informed him that Deputy DeWyse was leaving the position and asked that he consider reassuming the role. *Id.* at 19, 31.

## ARGUMENT

Defendants make a number of arguments which are incorrect either based on fact or law. These are addressed in turn. But first, a better understanding of the illegal actions of Sheriff Federspiel and his subordinates should be explained.

### *Sheriff's Office Broke the Law*

Sheriff Federspiel loves civil forfeitures and the money it brings in. Gus Burns, *Value of Property Seizures from Suspected Criminals in Saginaw County Quadrupled Last Year*, MLIVE.COM, May 16, 2010 *available at* http://s.mlive.com/Gj8Aidm. Within the Michigan Public Health Code, it has a clear civil forfeiture process. See MCL 333.7521 et seq. Before property is adjudicated or deemed forfeited, it is held "in the custody of" the Sheriff's Office when it is the seizing agency. MCL 333.7523(2). "When property is forfeited under [the Public Health Code's forfeiture provisions], the local unit of government that seized the property may take one of four actions:

a) Retain the property for official use.

b) Sell the property that is not required to be destroyed by law and that is not harmful to the public. *The proceeds and any money, negotiable instruments, securities, or any other thing of value as described in section 7521(1)(f) that are forfeited under this article shall be deposited with **the treasurer of the entity having budgetary authority over the seizing agency** and applied as follows:*

   i. For the payment of proper expenses of the proceedings for forfeiture and sale, including expenses incurred during the seizure process, maintenance of custody, advertising, and court costs, except as otherwise provided in subsection (4).

   ii. The balance remaining after the payment of expenses shall be distributed by the court having jurisdiction over the forfeiture proceedings to the treasurer of the entity having budgetary authority over the seizing agency. If more than 1 agency was substantially involved in effecting the

-10-

forfeiture, the court having jurisdiction over the forfeiture proceeding shall equitably distribute the money among the treasurers of the entities having budgetary authority over the seizing agencies. A seizing agency may direct that the funds or a portion of the funds it would otherwise have received under this subsection be paid to nonprofit organizations whose primary activity is to assist law enforcement agencies with drug-related criminal investigations and obtaining information for solving crimes. The money received by a seizing agency under this subparagraph and all interest and other earnings on money received by the seizing agency under this subparagraph shall be used only for law enforcement purposes, as appropriated by the entity having budgetary authority over the seizing agency. A distribution made under this subparagraph shall serve as a supplement to, and not a replacement for, funds otherwise budgeted for law enforcement purposes.

c)   Require the administrator to take custody of the property and remove it for disposition in accordance with law.

d)   Forward it to the bureau for disposition.

MCL 333.7524(1)(a)-(d). In February 2014, Detective John Butcher of the Saginaw County Sheriff's Department was operating in Genesee County, Michigan in coordination with United States Drug Enforcement Administration. Detective Butcher came in to contact with Pierre Najjar who was apparently suspected (but never charged or convicted) of engaging in criminal activity related to controlled substances. Instead of following the obligations provided by the Public Health Code's civil forfeiture process, Detective Butcher offered Mr. Najjar a side-of-the-road, middle-of-the-night

"deal." In lieu of proceeding with criminal charges and formal civil forfeiture of Najjar's real and personal property, Detective Butcher demanded that Mr. Najjar give the Sheriff's Office $22,583 in cash and surrender various handguns in exchange for him to keep his Audi.[5] A police report dated February 28, 2014 authored by Detective Butcher shockingly corroborates this entire series of events. **Exhibit H.**

Contrary to Defendants' assertion of a "profound misunderstanding of the forfeiture and vehicle buy-back process," such action by Detective Butcher (as documented by him) is illegal criminal <u>extortion</u>. MCL 750.213.[6] Detective Butcher was never charged with felonious extortion. But even assuming that Detective Butcher thought and acted as if it were a forfeiture, MCL 333.7524(1)(b) directs what is to happen when money is forfeited by Mr. Najjar— it "<u>shall</u>[7] be deposited with the treasurer of the entity having budgetary authority over the seizing agency." That would be Saginaw County

---

[5] The Audi was never forfeited to the Sheriff's Office so neither that law enforcement agency or the County had a legal way of "selling" it back to Mr. Najjar on the side of the road in Flushing, Michigan.

[6] Any person who shall … maliciously threaten to accuse another of any crime or offense … [or] threaten any injury to the person or property … with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony.

[7] Under Michigan law, the use of the word "shall" means there is no available discretion. *Manuel v Gill*, 753 NW2d 48 (Mich. 2008).

Treasurer Timothy M. Novak.[8] Instead, Detective Butcher submitted the forfeited funds to the Sheriff Office's property evidence room (which was ultimately the downfall of how this matter reached the light of day) instead of the county treasurer's office. It is believed this was done to have access to new buy bag money not being provided by the County. It was misrepresented to Deputy DeWyse as evidence in an evidence bag.[9]

Later, Deputy DeWyse was requested—contrary to his usual, regular, and ordinary job duties due to the illness of Undersheriff—to compile information for a state-mandated report[10] disclosing all moneys and property seized by the Sheriff's Office pursuant to civil forfeitures. It was from his interactions that he then realized the $22,583 seized was not evidence but instead was civil forfeiture funds that had not be deposited with the Saginaw County treasurer. State law required their deposit with the Saginaw County treasurer, MCL 333.7524(1)(b), and to be allocated for appropriate uses solely by the Board of Commissioners as the entity having budgetary authority over Sheriff's Office, MCL 333.7524(1)(b)(ii). This was never done.

---

[8] The County of Saginaw, as headed by the Board of Commissioners, is the entity having budgetary authority over the Sheriff's Office. The treasurer of Saginaw County is Timothy Novak. See http://www.saginawcounty.com/Treasurer/

[9] Plaintiffs' counsel has sought to inspect the bag in discovery (to take pictures of the same) and Defendants and their counsel have flatly refused to produce the same for inspection. Should trial occur, that bag will be subpoenaed for presentation to the jury.

[10] Making this report was not the ordinary or usual duty of Deputy DeWyse then or now.

It was never done *intentionally* at the direction and decision of Sheriff Federspiel; Sheriff Federspiel *admits he gave the order* to use the $22,583 instead of obeying his statutory obligations under MCL 333.7524(1)(b). **Exhibit C, Audio (June 1, 2016), at 33:30 - 36:30** (available at https://youtu.be/mjS6KVRfEac). This is because Sheriff Federspiel views forfeiture money has "his" and not within the provenance of the Board of Commissioners (i.e. the controller's office) even though the law says otherwise. ***Id.* at 31:00 – 31:45.** Deputy DeWyse explain at the June 1, 2016 meeting why it was illegal (***id.* at 18:50 – 26:30**); the Sheriff simply tries to explain away why it is not and concludes otherwise. ***Id.* at 25:30 – 26:45.** The Sheriff is legally wrong. MCL 333.7524(1).

Realizing the scope of the illegality going up the chain of command, Deputy DeWyse reported the same to the County Finance Director in January 2016. **Exhibit I**, page 392-393. In response, Deputy DeWyse was not given a medal for his heroism, but instead investigated by then Lieutenant (now recently promoted Undersheriff[11]) Gomez, transferred from his plum property room clerk position on false pretenses, called into the Sheriff's Office for a verbal reprimand, told he was going to punished for reporting the illegality outside the chain of command, and shortly thereafter

---

[11] https://www.wsgw.com/saginaw-county-sheriff-appoints-new-top-assistant/

re-assigned back to summer roadkill carcass duty despite the position at juvenile never having been previously been assigned the same.

### First Amendment Violation

Defendants first argue that Deputy DeWyse's reporting of the illegal activities of Sheriff Federspiel and his police agency was speech and a public employer may control speech. That is true but an over-generalization. Such control is not without limits. "Public employees do not renounce their citizenship when they accept employment, and [the Supreme] Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." *Lane v. Franks*, 573 U.S. 228, 236 (2014).

To state a claim for First Amendment retaliation, a public employee must satisfy three requirements. He must show that (1) he spoke as a private citizen (2) on a matter of public concern, and (3) that his speech interest outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017). This third factor is known as the *Pickering* balancing test. See *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004). This law was however upended in 2014 when the US Supreme Court decided *Lane v. Franks*.

-15-

*Lane* unremarkably confirms that *Garcetti*[12] previously provided a two-step inquiry into whether a public employee's speech is entitled to protection under the First Amendment:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises.

> The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Id.* at 237. The public employee exception to First Amendment protection "must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment" and only when "*ordinarily* within the scope of an employee's duties, not whether it merely concerns those duties." *Haddad v. Gregg*, 910 F.3d 237, 246 (6th Cir. 2018). In other words (and as to the first prong), when public employees make statements not pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline. *Lane, supra,* at 237.

But this where *Lane* changed the ground rules. After describing essentially the same pre-*Lane* analysis undertaken by Defendants in their

---

[12] *Garcetti v. Ceballos*, 547 U.S. 410 (2006)

brief, the *Lane* Court then created a new bright line separation between when a public employee speaks as a *citizen* versus as a *public employee* even from information obtained in the course of employment. It narrowed the availability of employer-defendants to utilize public employee status to punish certain speech. *Lane* held—

> the mere fact that a citizen's speech concerns information acquired by virtue of his public employment *does not* transform that speech into employee — rather than citizen — speech. The critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties, not whether it merely concerns those duties.

*Id.* at 240 (emphasis added). So the question is clear: was Deputy DeWyse's report of illegal activity[13] by Sheriff Federspiel and his subordinates (who are all higher ranking officials to Deputy DeWyse) to the public oversight authority part of his normal and regular job duties? The answer is no. **Exhibit B, ¶12.** Deputy DeWyse worked in the property room and only came to learn of the illegal action when covering the job deputies of another, the Undersheriff. Reporting illegal actions of Sheriff Federspiel and other members of the Sheriff's Office was not *ordinarily* within the scope of an employee's duties. Sheriff Federspiel even confirmed that reporting the

---

[13] Defendants suggest that the illegal actions reported by Deputy DeWyse were merely "bad accounting practices." It was far more than that. As explained below, it is a clear violation of state law to not report forfeiture monies to the county treasurer (which is wholly different than the county finance director) and to spend those monies without authorization by the Board of Commissioners for the County of Saginaw.

same to civilian oversight personnel by expressing to Deputy DeWyse that doing so violated the "chain of command" obligation he had to the Sheriff's Office. **Exhibit K.**[14] As such, Deputy DeWyse was undoubtedly speaking with the civilian public authorities as a private citizen and not pursuant to his *ordinary* job duties. *Lane, supra*, at 247 (THOMAS, J., concurring); **Exhibit B, ¶12.**

In support of its position that speaking about misappropriation of funds and illegality is not private speech, Defendants cite *Omokehinde v Det. Bd. Of Ed.*, 563 F.2d 717 (E.D. Mich. 2008). In that case, plaintiff was a parent/community liaison employee with Detroit schools. Her boss was using Title I funds designated for parental involvement activities for an alleged illegal purpose. Plaintiff objected to her boss, who ignored her and created a hostile work environment. Plaintiff, after being on medical leave, sent an anonymous letter to a Detroit Free Press reporter who later did an investigative report about the wrongful expenditures. Two months later, plaintiff was dismissed due to economic necessity.

Defendants also fail to realize the most obvious problem—*Omokehinde is* a pre-*Lane* decision. Lane focused the analysis on whether

---

[14] As such, the reporting of the Sheriff's Office illegal actions was neither part of his regular job duties nor was it "ad hoc or de facto" duties either based on Sheriff Federspiel's explanation in this audio recording.

the information being convened by the speaker was part of its their *ordinary* job duties. The plaintiff's ordinary duties in *Omokehinde* was administering Title I monies. Here, the reporting of forfeiture monies and the reporting of illegal activities by the Sheriff's Office personnel as to use of misappropriate forfeiture funds was not part of the ordinary or usual job duties of Deputy DeWyse. As such, *Omokehinde* is easily distinguishable and of no help to Defendants.

Defendants also cite another pre-*Lane* case, *Meggison v. Charlevoix County*. *Meggison* is also of no help to Defendants because the plaintiff in *Meggison* was speaking at the county board of commissioners meeting and meeting separately with a reporter not as the person directly responsible for the air quality problem at the jail. Air quality at the jail was her usual and ordinary role as it applies to her regular job duties as the liaison for the industrial hygiene issue at the jail. Again, *Meggison* is distinguishable.

Defendants are failing to grasp the obvious distinction between when a person speaks a private citizen versus as a public employee. Lane provides the answer— citizen's speech concerns information acquired by virtue of his public employment *does not* transform that speech into employee. Instead, a public employee speaks as a public employee only when the speech at issue is itself *ordinarily* within the scope of an employee's

duties, not whether it merely concerns those duties. Because the reporting of forfeiture monies (i.e. Undersheriff's job[15]) and the reporting of illegal activities by the Sheriff's Office personnel (which was never Deputy DeWyse's usual job) as to use of misappropriate forfeiture funds was not part of the ordinary or usual job duties of Deputy DeWyse. When spoke to the County about the same in 2016, it was a private citizen under *Lane*.

### *Matters of Public Concern*

Next, Defendants argue that the reporting of illegal activity by Sheriff Federspiel and members of the Sheriff's Office—i.e. not depositing monies with county treasurer and using funds not lawfully allocated by the Board of Commissioner as required by MCL 333.7524—to the public civilian oversight authorities were not matters of public concern. That is clearly inaccurate. The reporting of illegal activities of an elected public official like Sheriff Federspiel and other sheriff office employees (who are themselves charged with enforcing the law) is clearly a matter of public concern as a matter of law. *Lane, supra*, at 229 (misuse of state funds [] obviously involves a matter of significant public concern); see also *Garcetti, supra*, at 425 ("Exposing

---

[15] While vaguely done, Defendants concede that making the state-mandated report "duties were typically performed by the Under-Sheriff." Brief, p. 17. They offered no evidence that this report generation was ever the usual or ordinary duty of any of the positions held by Deputy DeWyse.

governmental inefficiency and misconduct is a matter of considerable significance"). This Circuit concurs—"speech addresses a matter of public concern when it alleges [*inter alia*] corruption and misuse of public funds." *Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015). (citing *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576-577 (6th Cir. 1997)); see also *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 896-97 (6th Cir. 2003) (failing to follow state law is of public concern).

In also noteworthy to look at the report itself. While MCL 333.7524 requires that the money be turned over to the county treasurer (and not the Sherff's Office) and then appropriate by the Board of Commissioners (and not the Sheriff's Office), the Sheriff's Office did none of these things for the $22,583 "forfeited" from Mr. Najjar. However, the 2015 report falsely states that this money was "turned over to Saginaw County Government General Fund to be utilized for further law enforcement operations." The report, signed by

### *Balance of Interests*

If an employee speaks as a citizen on a matter of public concern, the next question is whether the government had "an adequate justification for treating the employee differently from any other member of the public" based

on the government's needs as an employee under *Pickering*. *Lane*, *supra*, at 242 (citing *Garcetti, supra*, at 418).

However, like the employer in *Lane*, these Defendants' side of the scale is completely empty because there cannot any interest in quashing the reporting of illegal activities of public officials. Defendants suggest the failing the chain of command policies is justification to retaliate against Deputy DeWyse (thought assignment to roadkill carcass patrol is an extreme reassignment). But Deputy DeWyse having followed that chain of command is and would be pointless because Sheriff Federspiel himself *authorized* the illegal activity of not properly reporting and undertaking unauthorized use of forfeited monies. **Exhibit C, (June 1, 2016 Audio), at 33:50-36:30** (https://youtu.be/mjS6KVRfEac).

Defendants attempt to argue that making the report of illegally kept and not reported forfeited monies impacts the maintenance of confidentiality regarding both the source and the use of these forfeited funds to "run" Pierre Najjar as a confidential informant. This argument is easily rejected—two illegal wrongs do not make a right. The Sheriff's Office incredulity is asking this Court to find that the Sheriff's Office has an interest in perpetuating the illegality of its own actions by violating state law, hiding from civil control that forfeiture monies, and using the same without authorization from the County

of Saginaw as the Sheriff Office's budgetary overseer. But there is an even baser problem than that. Defendants have offered no proof that Pierre Najjar actually was, in fact, ever a confidential informant. Plaintiffs believe he never was and there has been no proof to the contrary. Instead, Najjar was unfortunately used as merely a means to obtaining needed "bag" money when the County of Saginaw refused to provided replenishment due to irregularities of the use of prior bag money. **Exhibit I, page 367.**

Defendants finally argue that "the money seized from Najjar was forfeited and used to fund the Sheriff's undercover investigations of that drug enterprise." First, the $22,583 was never *forfeited* by Najjar, it was *extorted* from him. Second, the money was seeming claimed (without any proof to this court) to be used for undercover investigations. That may be, but the use of that money without the required depositing, reporting, and the lack of allocation by the Board of Commissioners for that purposes rendered the use of the same illegal. Defendants cannot seriously, with a straight face, suggest that *illegal* actions under state law are *adequate* justification under *Pickering*. Defendants are only "afforded greater leeway to control speech that threatens to undermine the [government]'s ability to perform its *legitimate* functions." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). Because what

was reported by Deputy DeWyse was clearly *illegal* and *illegitimate;* the Defendants' arguments fail.[16]

### *Monell*

Defendant County of Saginaw and Defendant Sheriff Federspiel in his official capacity[17] assert they cannot be held liable under a theory of *respondeat superior*. Both are right, generally. *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, when a plaintiff can show a policy or custom is a moving force of the constitutional violation, liability attaches. One of those methods is known as the *Pembauer* methodology (or as Defendants call it, the "single act theory"). *Pembauer v. City of Cincinnati*, 475 U.S. 469 (1986). Municipalities are liable even for a single unconstitutional decision that is improperly made when the decision made was rendered by the final policy-making authority. *Id.*, at 480 It is undisputed that the illegal retaliation for reporting the illegal forfeiture spending and lack

---

[16] Defendants assert they have "a distinct interest in maintaining confidentiality regarding both the source and the use of these forfeited funds. The information disclosed by Plaintiff to non-law enforcement personnel outside the chain of command created a risk to harm to Mr. Najjar, the undercover officers and the civilian informants used to purchase narcotics." In reality, the actual reason for the confidentially desired was to prevent the disclosure of the illegal activities of the Sheriff and his underlings. Defendants have offered no proof that Najjar was or become a confidential informant. Arguments as to being a CI are false and a smoke-screening to hide the real reason for forced wagon-circling—to keep a lid on illegal operations as to forfeiture monies and extortion.

[17] When Sheriff Federspiel was sued in his official capacity in this matter, see **Compl., ECF No. 1**, "the real party in interest is the government entity, not the named official." Lewis v. Clarke, 137 S. Ct. 1285, 1292 (2017).

of reporting was done (or at least acquiesced[18] to) by Sheriff Federspiel. He is the highest elected official and executive officer of *the county's* law enforcement." *Margaris v. Genesee Cty.*, 324 Mich. App. 111, 116 (2018). As such, his singular act can fulfill the *Monell* standards. He confesses on audio to ordering and acquiescing to the same. **Exhibit C, (June 1, 2016 Audio), at 33:50-36:30** (https://youtu.be/mjS6KVRfEac).

Nevertheless, Defendants do raise an interesting question: who is the "municipality" in this case, the County of Saginaw or some state constitutional office when Sheriff Federspiel was sued in his official capacity while also naming Saginaw County? On one hand, matters pertaining to law enforcement and the hiring, firing, and disciplining of department personnel come within the scope of the Sherriff's executive authority, *National Union of Police Officers Local 502-M, AFL -CIO v. Wayne Co. Bd. Of Comm'rs*, 93 Mich App 76, 82-83 (1979), and "the sheriff is the highest elected official and executive officer of *the county's* law enforcement." *Margaris, supra,* at 116. On the other hand, the Michigan Constitution directs that "[t]he county shall never be responsible for [the Sheriff's] acts, except that the board of

---

[18] A custom or policy can be shown by "proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local, Amer. Postal Workers Union, AFL-CIO v. City of Memphis,* 361 F.3d 898, 902 (6th Cir. 2004).

supervisors may protect him against claims by prisoners for unintentional injuries received while in his custody." Const. 1963, art VII, § 6; see also *Graves v Wayne Co,* 124 Mich App 36, 42 (1983) (Const 1963, art VII, § 6 "exempts a county from any vicarious liability arising from acts of the county sheriff"). It is unique academic question, but is merely that as a state constitutional provision does not trump federal law. See U.S. Const., art. VI, § 2 Because state law clearly establishes Sheriff Federspiel is a final policy maker for Saginaw County as to employee matters for those who work and operate in the Sheriff's Office, his decisions are policies on behalf of Saginaw County.[19]

### WHISTLEBLOWER

As Count II of the Complaint, Deputy DeWyse alleges a violation of the Michigan Whistleblower Statute as a "Type I" whistleblower. **ECF No. 1, ¶¶70-74.** MCL 15.363(1), the statute of limitations governing WPA actions,

---

[19] This is further supported by the legal holding that the Office of Sheriff is not a separate legal entity able to be sued by law under § 1983. See *Ostipow v. Federspiel*, 2018 U.S. Dist. LEXIS 117550, at *8 (E.D. Mich., July 16, 2018). Rather it is merely an agent of Saginaw County. *Id.* (citing *Dayson v. Rondeau*, No. 12-1310, 2013 U.S. Dist. LEXIS 60474, 2013 WL 1818628, at *8 n.2 (W.D. Mich. Apr. 29, 2013) ("The drug enforcement team is alleged to be a task force of the Cass County Sheriff's Department, which does not exist as a separate legal entity. The drug enforcement team, like the Cass County Sheriff's Department, is simply an agent of the county."); *Veliz v. Bouchard*, No. 05-60039, 2008 U.S. Dist. LEXIS 19945, 2008 WL 719251, at *1 (E.D. Mich. Mar. 14, 2008) ("Finally, the claim against the Oakland County Sheriff's Department shall be dismissed, as under Michigan law the Sheriff's Department is not a separate legal entity from Oakland County, and therefore not subject to suit.").

provides that "[a] person who alleges a violation of this act may bring a civil action for appropriate injunctive relief, or actual damages, or both within 90 days after the occurrence of the alleged violation of this act." The question then becomes what constitutes "the occurrence of the alleged violation of this act" that triggers the running of the statutory limitations period. On March 29, 2019, the Michigan Supreme Court answered that issue as a matter of first impression. *Millar v. Const. Code Auth'y.*, 912 N.W.2d 521 (Mich. 2018). It answered that question by borrowing the standards utilized by a different statutory scheme under the *Elliott Larson Civil Rights Act*. While the facts of this case still suggest that retaliation was continuing to occur throughout 2016 and into 2017 (e.g. installing video cameras) until Deputy DeWyse was constructively discharged in early 2017, the Michigan Supreme Court held that the WPA claim accrues not upon the date Deputy DeWyse was terminated but rather it is the employer's action *to implement the decision* that triggers the running of the limitations period. As the facts above outline, that retilation occurred by reassignment back to roadkill carcass duties starting in June 2016 (right after the Federspiel June 1, 2016 meeting) and going went through election day in August. As such, the statute of limitations on a robust claim has lapsed and that singular claim must be dismissed.

## RELIEF REQUESTED

WHEREFORE, the Court is requested to deny summary judgment as

to Count I and set this matter for trial.

Date: August 5, 2019                     RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
OUTSIDE LEGAL COUNSEL PLC
BY PHILIP L. ELLISON (P74117)
Co-Counsel for Plaintiff
PO Box 107 · Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

MATTHEW E. GRONDA (P73693)
Co-Counsel for Plaintiff
4855 State Street, Suite 6A
Saginaw, MI 48603
(989) 249-0350
matthewgronda@gmail.com

## CERTIFICATE OF SERVICE

I, the undersigned attorney of record, hereby certify that on the date stated below, I electronically filed the foregoing with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel or parties of record.

Date: August 5, 2019                    RESPECTFULLY SUBMITTED:

/s/ Philip L. Ellison
OUTSIDE LEGAL COUNSEL PLC
BY PHILIP L. ELLISON (P74117)
Co-Counsel for Plaintiff
PO Box 107 · Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

MATTHEW E. GRONDA (P73693)
Co-Counsel for Plaintiff
4855 State Street, Suite 6A
Saginaw, MI 48603
(989) 249-0350
matthewgronda@gmail.com