

EXHIBIT
N
OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

## INTERNAL INVESTIGATION:

On 02-04-16 I was ordered by Sheriff Federspiel to conduct internal investigation into allegations made by Dep. Garrett Dewyse regarding the handling of forfeiture money in case 14-17300787. I was to investigate why the proper chain of command was not followed as well.

**Dep. Garrett Dewyse Statement:**

02-04-2016 13:18 hrs. I spoke to Dep. Garrett Dewyse. Present with Dep. Dewyse was his union representation Dep. Wade Swalwell. Dep. Dewyse said he was the property room deputy from August 2011 until January 30, 2016. I told Dep. Dewyse I wanted to talk to him regarding one of Det. John Butcher's cases in which 22 thousand or 23 thousand dollars had been seized by the Saginaw County Sheriff Office from a DEA task force case. Dep. Dewyse said he knew which case I was talking about.

The allegations were against Det. John Butcher and Lt. Randy Pfau. Dep. Dewyse said he remembered the case was a Butcher case. His understanding of forfeitures is that when funds are adjudicated the funds are supposed to go to the general fund of the municipality not the general fund of the department. So if funds were removed from evidence and used for something like " CI" buy money they would not be going to the general fund as the law states it should. Dewyse said the case had not been adjudicated. Dewyse said he had no knowledge of the case being adjudicated. Had no knowledge if the funds had been awarded to the Sheriff Department or not.

Dewyse said he, Butcher and Lt. Pfau had a meeting when it was decided that the money would be used by Butcher. Dewyse said, right from the beginning he told them he didn't feel it was proper. He told them the funds should be adjudicated, turned over to the county and then they should get "buy" money from the county and it could be recorded. He said they needed money right away and Lt. Pfau said to him this is what we were going to do and then told him to go to the property room with Butcher. Butcher removed the money to use for "buy" money. After this he sent the accountant and Lt. Pfau an email to tell them what happened because the money was going to be short and she kept really good records of what was in the safe. This created more meetings because Connie, the accountant, didn't think it was right either. This continued until the entire item had been exhausted (money).

By continued he means, Butcher using the money to pay "CI's". Dewyse said again he never saw any forfeiture forms that would allow the money to be deposited. Dewyse said he believed it should have been adjudicated here in Saginaw but was a DEA case. Dewyse said he didn't know where it came from. Dewyse said at this time there was a system in place, that when Butcher would get his forfeiture orders items, they, being he and Butcher, would meet with Lt. Pfau and sometimes the undersheriff. Dewyse would bring the evidence from the property room and they would count it in front of each other, and then turn it over to the general fund of the county. He said he didn't see this occur on this one.

I asked what happened when money was taken out of the fund. Dewyse said, When Butcher received money there would be a hand written receipt generated and this would be placed in the safe with the remaining money. When the entire fund was gone Butcher signed a property receipt then took all the

DEF378

documentation. Dewyse said his understanding of the forfeiture laws, when something is deemed forfeit it is to be placed in the general fund of the county, so by not depositing it in the general fund of the county didn't seem right to him. He got his information and understanding of the law from a copy of a law book. Dewyse said he had a sheet or page of a law book taped up on the door in the property room.

The first time it happened he voiced it to Lt. Pfau then to Connie, because she kept the records on those funds he felt it necessary to inform her of the money that was withdrawn by Butcher to maintain proper record of the unadjudicted funds that are still remaining

Second time, by then there was a meeting in which Lt. Pfau decided Sgt. Kerns would be documenting the withdrawals in the journal section of the report. Kerns documented every time Butcher got money. Didn't voice any concerns because he had already said something to Lt. Pfau and Lt. Pfau said we were going to go along with this the first time. Dewyse said he did not go to Undersheriff or Sheriff. Dewyse said he did not go to outside agency. Dewyse said he didn't tell anyone else.

Dewyse said he was not given a reason why the money could be used by the Department. Next meeting was with Butcher, Pfau, US Hart, Connie Sullivan, Koren Reaman and himself. To discuss this case and how they were going to deal with it and whose responsibility it was going to be to create the numbers for the year end forfeiture report. The US said he would do the yearend report. Dewyse said from the meeting he was under the impression that the accountants were under the impression the money would be replenished and filtered through the general fund as it was adjudicated. He was not specifically told this was going to happen he was just under the impression it was going to happen. Butcher continued to take money from the safe. The accountants new Butcher was taking the money until the money was completely used up. The accountants knew about it from day one because he told Connie.

Within the last few weeks he went to someone else about this money. Dewyse acknowledges he had his meeting with Connie, Koren, Lt. Pfau Undersheriff and Butcher. Dewyse said two weeks ago US asked him for unadjudicated amounts in the safe so that he could prepare the yearend 2015 report for the controller's office. The Undersheriff was sick so he met with the sheriff, and asked sheriff if he was going to prepare the report or was the Undersheriff. Dewyse said later the Sheriff contacted him and told him, he was to prepare the report. The controller's office sent him the amounts that the sheriff dept had deposited. Used those numbers of the adjudicated then complied the numbers in the safe to come up with the unadjudicated amount.

When he prepared the report he realized the last of the money was used by Butcher. When he took the numbers to Koren Reaman, he told her that unadjudicted money was in there and voiced concerns to Connie and Koren even though they were in the meeting when the money was discussed originally. Dewyse did not give them any paperwork regarding the money. Only paper work he, Dewyse, had in the safe was the last receipt signed by Butcher.

Dewyse again said he didn't say anything because when he told Lt. Pfau he was told "they didn't have a choice this was what they were going to do". Dewyse said he took that as an order. Dewyse said he

**DEF379**

didn't inform the Undersheriff or the Sheriff and had no explanation other than he didn't think anything would happen.

### Det. John Butcher Statement:

On 02-04-2016 at 14:09 Hrs. I spoke with Det. John Butcher. Det. Butcher agreed he was comfortable speaking without union representation. Det. Butcher said there was a case generated in 2014. 14-17300787 DEA case IP-14-0005. Det. Butcher said he was working with /DEA. Det. Butcher said the case generated in Genesee County Flushing MI. Generated and adjudicated in Genesee County. The case was a drug case with the suspect being, Pierre Najjar. Total seized $22,583.00 US currency 2 handguns and a 2011 Audi (car), as part of narcotics investigation in conjunction with DEA. This case didn't go to court. The DEA agent in charged decided to handle the case within the agency. Pierre agreed to not go through with forfeiture proceedings on the US currency or the handguns in exchange for the vehicle. The agreement was made and signed by Pierre, the Saginaw County Sheriff Office received the $22,583 in cash and the two handguns ( Sig Saur and Kimber Arms) and Pierre received the vehicle. The Saginaw County Vehicle Sell Back form was used. Pierre was never in Saginaw County. The paperwork used was Saginaw County Sheriff Dept. paperwork due to Det. Butcher being the only task force agent with DEA on this case, all occurred in Flushing on night of the seizure. The US currency and the two handguns were transported to the Saginaw County Sheriff Dept. and placed in the property room. No further adjudication was necessary.

At the time of the incident the Law Enforcement Division Commander was Lt. Randy Pfau and the property room deputy is Garrett Dewyse. It was decided to use the funds from the $22,583 for buy money and a portion was used to pay the informant from the case and a portion was given to the Flushing PD for their cooperation. After these amounts were taken from the original $22,583 approximately $13,000 or $14,000 was the amount the Saginaw County Sheriff's Office ended up using for other drug cases, "buy money". The decision was made by Lt. Pfau. The Undersheriff was informed the money would be used by Det. Butcher and then later D/Sgt. Kerns was also notified. Butcher did not hear Dep. Dewyse had concerns over the use of the money. Det. Butcher said a ledger was kept of the money taken out signed by Dep. Dewyse and himself. Det. Butcher said he didn't remember Dewyse ever telling him he didn't think they should be using the money.

Det. Butcher said if the case had been generated in the county, then the forfeiture paperwork would go to the Saginaw County Prosecutor's office, if nobody post bond after 20 days the money would go into an adjudicated account and the forfeiture would need to be signed off by a prosecutor, saying no one posted the bond and the money was awarded to the Saginaw County Sheriff. These steps would be followed for the accountant to accept the money into our account. for this 10% would go to the prosecutor's office. This didn't happen in this case because the prosecutor's office didn't have anything to do with the case.

Det. Butcher said he didn't remember a meeting with regarding the case. Butcher said Pfau, Kerns, Connie Garrett and the Undersheriff would be present when he replenished his money bag. Butcher

**DEF380**

said there was no real discussion regarding the case. Only 3 of the people present had to sign for the money. Det. Butcher said the last receipt and ledger went to Lt. Pfau then the Undersheriff.

### D/Sgt. David Kerns Statement:

I spoke with D/ Sgt. David Kerns On February 17, 2016. Kerns agreed to give his statement without union representation but did invoke his Garrity rights. I informed Sgt. Kerns the case regarding the internal investigation, being 14-0787 also involving a DEA case, occurred February 27 2014 conducted by Det. Butcher. Kerns became Det. Sgt. in February 2012 and was the direct supervisor of Det. Butcher at the time of this case. Det. Butcher became a member of the DEA task force sometime after Kerns took over as supervisor of the Saginaw County Sheriff Detective Division. Det. Butcher was under his supervision and DEA agent Don Grace. At this time Det. Butcher was the only local officer in the unit. His duties are to investigate narcotics cases from Saginaw to the southwestern US and Mexico. Kerns said that Butcher's duties involve conducting drug forfeitures of currency and property. Sgt. Kerns said seized assets are awarded through non contestation or through the court. When awarded through the court, the prosecutor's office gets 10% of what's awarded when cases are adjudicated in Saginaw County. Kerns said the case in question was originated in Genesee County. The Saginaw County Prosecutor's Office had no involvement in this case and was not entitled to any of the proceeds regarding this case.

Kerns said his involvement in this case was, during the disbursements of the assets sometime around August of 2014. Kerns said to his knowledge $22,000 in cash, a high end vehicle and guns is what was forfeited. Kerns was asked if $22,583 in cash, 2 handguns and a 2011 Audi sounded correct and Kerns agreed that was what was forfeited. Kerns said the final outcome was done as a "vehicle buy back". The individual whose property it was originally would receive the 2011 Audi and in turn he would not pursue a claim for the handguns and cash. Kerns agreed that was his understanding of the agreement. Kerns believes, this was decided by the DEA agent in charge. Kerns said he began a journal regarding the disbursement of the cash. Kerns said he didn't know what happened with the handguns. Kerns said some of the funds were disbursed prior to his involvement. There was a meeting in August 2014, involving this case in which, Connie Sullivan, Lt. Randy Pfau, Det. John Butcher, Dep. Garrett Dewyse and himself, discussed the money disbursements and it was decided that a journal would be started to keep track of the disbursements of the funds. Det. Butcher and Dep. Dewyse had a different system in which a ledger was used and kept in the property room. Kerns said the money and handguns were the sole property of the Sheriff's Office. Kerns said the only other agency that received any money from this case was the cooperating agency of Flushing PD. Flushing PD was given a portion of the money because the investigation began from information that came in through

their department. The remaining balance went to the Sheriff's Office. Kerns said the money was used by the Saginaw County Sheriff Office to further other drug investigations, "buy money, CI money"...."all of it". Kerns said the extent of his involvement was journaling the disbursement of the money. Kerns said he started the Journal the same day as the meeting in August 2014. Sgt. Kerns said everyone in the meeting was on the same page as to what the money was going to be used for and how it was going to be documented, including the previous disbursements. Dep. Garrett Dewyse, at this time was the property room deputy. Sgt. Kerns said everyone knew the terms of what is going to happen. I asked Sgt. Kerns if he knows any reason why Connie Sullivan had to be reminded of this case. Sgt. Kerns said he believes this came back up in February of 2016 because Dep. Dewyse has a personal issue with the Sheriff, William Federspiel, because he feels he should not have been moved out of the property room. Sgt. Kerns said he has personal knowledge of Dep. Dewyse not being happy because Dewyse voiced his displeasure directly to him. Sgt. Kerns said he and Dewyse were in a vehicle together and Dewyse told him he wasn't happy. Dewyse said he was told by Dep. Wehner he would not come back inside and would not bump him. Dep. Wehner did in fact exercise his sonority rights by contract and bumped Dep. Dewyse out of the property room.

Sgt. Kerns said from August 2014 to mid January 2016 there is no more conversations regarding this money and everything went by the agreement of how it was going to be documented. This was documented until the money was exhausted. Sgt. Kerns said there was not any reason for Dewyse to broach the subject again with anyone in the controller's office or treasures office. Sgt. Kerns said everyone had already agreed, no one objected in the meeting in August, Dep. Dewyse didn't object.

Sgt. Kerns has been a police officer for 18 plus years, detective for 10 years and supervisor for 3 plus years. Sgt. Kerns doesn't believe any impropriety in any way, what so ever took place and if he had he would have voiced his opinion all the way up the chain of command.

Dep. Charles Wehner Statement:

I spoke with Dep. Charles Wehner 02-17-16. I informed Dep. Wehner of the internal and he agreed to speak without union representation. Dep. Wehner was the property room deputy left and went to the contract position in Merrill Village then came back January 27, 2016 for training and back alone February 1, 2016. Dep. Wehner was trained by Dep. Garrett Dewyse on January 27th 2016 thru January 29th 2016. Garrett spoke to Koren Reaman sometime in those three days. Garrett told Koren that money was given to somebody at the request of a lieutenant. Dep. Dewyse gave the money to Lt. Pfau and Det. Butcher. Garrett said Lt. Pfau went into the property room and ordered him to give money to Det. Butcher for buy money, even though there was no order from the courts or forfeiture form.

DEF382

When Dep. Wehner worked before Det. Butcher and Dep. Anderson, money would come in he would receive a forfeiture form or release of some sort. Garrett tells him the money was in there and then says the money was given to Det. Butcher to be used as "buy money or CI money". Doesn't say he's going to tell Koren about this money, doesn't say there had been a meeting regarding this money already, doesn't say anything about the meetings, just that he was ordered to give Det. Butcher the money. Dep. Wehner said Dep. Dewyse gave him the impression he had no idea how the money was going to be used or anything else about the money.

### Lt. Randy Pfau Statement:

I spoke with Lt. Randy Pfau on 04-18-2016. I explained why I was there to speak with him. I told the Saginaw County case number and the DEA case number. Pfau said he was familiar with the case I was referring to. Pfau became the Law enforcement Lieutenant in January of 2014. Pfau was the Lieutenant in February 2014. Pfau said the decision of which cases to prosecute was a joint effort between Det. John Butcher and his supervisor at the DEA. Pfau said he agreed that money 2 handguns and a vehicle were forfeited by the unit Det. Butcher was in. Pfau agreed there was approximately $22583 in cash. Pfau said he was not part of the decision to make the suspect in this case a working informant. That decision would have been made between DEA and Det. Butcher. Pfau said he didn't know at the time what the decision was he was informed afterward. I asked Pfau if he was aware of the agreement between the DEA and the suspect, that he would not file a claim for the handguns or the money in which case the vehicle would be returned to him. Pfau again said he was not part of the decision so, he did not. I asked Pfau if he knew if Flushing PD received a portion of the money. Pfau said Flushing PD was involved in the some fashion of the money being obtained as part of the "buy back" transaction. Pfau said they would have received some portion of the forfeiture. Pfau said he didn't know if the Saginaw County received the entire sum of 22583 prior to Flushing PD receiving their portion or had Flushing PD been given their portion prior to the money coming to Saginaw County. Pfau said he wouldn't dispute if Butcher said the entire sum of 22583 came to Saginaw County and then Flushing PD was given a portion and a sum for the CI that started this investigation leaving 14000 or so for use by the Saginaw County Sheriff Dept.

Lt. Pfau said he knows Dep. Garrett Dewyse. Pfau said Dewyse was the property room deputy, during this time frame and making a complaint that the money from this case was misappropriated. Pfau said he didn't have direct knowledge but had heard that Dep. Dewyse was saying this. Pfau said Dewyse had never said anything to him. Pfau said there numerous opportunities in which they've met with other staff members regarding this case prior to this date April 18th 2016. Pfau said Dewyse never told him he was not comfortable with the money being used. Pfau said he didn't recall a meeting specifically for this money but knew there were meeting in which several cases were discussed. Pfau said there were meetings between himself, Det. Butcher, Garrett Dewyse, Connie Sullivan, and D/ Sgt. Kerns. Pfau said these meetings took place involving several cases. Pfau said he agreed he knew money from this specific case was used for further drug investigation by Det. John Butcher. Pfau said that decision was made by butcher and his supervisor and then informed the rest of the group. Pfau said the notes were kept on the property record and there was always a document or paper trail for the use of the money. I specifically asked if the other people name in the meeting agreed D/ Sgt. Kerns would keep journal

**DEF383**

entries in the report when money was taken would that help remember. Pfau said he agreed with that but that there was also documentation above Kerns making entries at his desk. There was documentation in the property room also. Pfau said in case of an audit it would show what money was removed and where it went.

I told Lt. Pfau the specific claim from Dep. Dewyse is he was ordered to give money from this case that was locked in the property room safe to Det. Butcher, by Lt. Pfau. Lt. Pfau said, "that's not truthful" Pfau said he would never have ordered Garrett to do something he wasn't comfortable with and he knows Dewyse never said he wasn't comfortable with giving Butcher the money. At the meetings no one ever said they weren't comfortable with how money would be used or documented. If someone had said they were not comfortable what he would have done. Pfau said the Undersheriff, Bob Karl was aware of all transactions. If there and been an issue Undersheriff Karl would have been notified. Pfau said on some occasions Karl was in the conference room during the discussions as the bags were, "re-upped". I asked Lt. Pfau if from time money was exhausted, April 08, 2015, has it ever come up again. Pfau said," neither this case nor any other cases have come up. This case had been reviewed by Undersheriff at that time and discussed in front of Garrett and Connie at no time did anyone say they had concerns. If there had been concerns with would have gone up the chain of command.

### Conclusion:

After speaking with the involved parties I have concluded that Dep. Garrett had no real reason to bring this case up after it had been discussed and resolved. It appears that this case was brought to the attention of Accountant Koren Reaman because Dep. Dewyse was not happy with being removed from his position as the property room deputy. Dep. Dewyse, in his own words, said there had been at least one meeting where this case was discussed in depth and all parties came to an agreement. Dep. Dewyse did not bring up his concerns with the Undersheriff at the time, Robert Karl. Dep. Dewyse did not bring up his concerns with the new Undersheriff Philip Hart. Dep. Dewyse did not bring up his concerns with Sheriff William Federspiel. Dep. Dewyse purposely misled Sheriff Federspiel when he approached him and asked him if he was supposed to fill out the year end forfeiture report as he had already been told by Undersheriff Hart that he, the undersheriff, would be doing the yearend report. Dep. Dewyse waited 9 months before supposedly voicing his concerns even though he had multiple interactions with Koren Reaman prior to the last week in January 2016. The first withdraw of money from this case was 03-19-2014. The last withdraw of money from this case was 04-08-2015. Dep. Dewyse purposely tarnished the reputations of The Saginaw County Sheriff William Federspiel, two undersheriff's Phil Hart and Robert Karl, Lt. Randy Pfau, D/Sgt. David Kerns and Det. John Butcher. He did this in two ways first by bringing this up to an outside person without notifying the chain of command and giving the administration the opportunity to explain and by these false accusations making their way to the internet and social media. Even if that was not his intent it would not have happened without the reckless actions of Dep. Dewyse.

For the reasons stated I believe the following policy violations have occurred:

GENERAL RULES OF CONDUCT

### 1.1 Loyalty

A. Employees shall maintain such loyalty to the Sheriff and all other members of the Office as is consistent with the Office's Code of Ethics.

### 1.4 Insubordination sub section B

In addition, it shall be insubordinate for any employee to engage in any deliberate physical attack or assault on a supervisor, or any disobedient, rebellious, insulting, vicious or incorrigible conduct calculated or intended to undermine the authority of supervisory personnel.

### 1.7 Truthfulness

Upon order of the Sheriff, his designee, or a supervisor, employees shall truthfully answer all questions asked of them, which are specifically directed and narrowly related to the scope of, their employment and the operations of the office.

### 1.19 Criticism sub section C

Derogatory remarks, either oral or written, about another member of the office with the apparent intent to undermine that person's position or authority are prohibited.

### 1.24 Official correspondence

A. Members of the office shall not engage in any correspondence with any person concerning their official activities except as provided by office orders.

B. Employees shall not disseminate for publication or broadcast over any radio or television station or permit to be published or broadcast any story, article, or other information concerning criminal cases or confidential police business or operations without the permission of the Sheriff or his designee.

### 1.29 Intervention / Interfering with Judicial process sub sections B and C

A. Employees shall not interfere with cases being handled by other members of the office or by any other governmental agency unless:

   1. Ordered to intervene by a supervisor.

**DEF385**

2. The intervening employee believes beyond a reasonable doubt that a manifest injustice would result from a failure to take immediate action.

B. Employees shall not undertake any investigation or other official action not part of their regular duties without obtaining permission from a supervisor unless the situation requires immediate action.

## LAW ENFORCEMENT DIVISION
## POLICY AND PROCEDURE LE-25

**EFFECTIVE DATE:** March, 2013
**SUBJECT:** Social Media Policy

### IV. PERSONAL USE

A. Precautions and Prohibitions – Barring state law or binding employment contracts to the contrary, department personnel shall abide by the following when using social media.

1. Department personnel shall not post, transmit, or otherwise disseminate any information nor make any statements about the guilt or innocence of any suspect or arrestee, or comments concerning pending investigations or prosecutions, nor post, transmit, or otherwise disseminate confidential information, including photographs or videos, related to department training, activities, or work-related assignments without the express written permission from the Sheriff or his/her designee.

DEF386