# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Garrett DeWyse,

|  |  |
|---|---|
| Plaintiff, | Case No. 17-cv-10044 |
| v. | Judith E. Levy<br>United States District Judge |
| William L. Federspiel, Heather<br>Beyerlein, and County of Saginaw, | Mag. Judge Patricia T. Morris |
| Defendants. | |

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [35]

Plaintiff Garret DeWyse brings a First Amendment retaliation claim against Saginaw County, its Sheriff, and a Deputy Sheriff under 42 U.S.C. § 1983. Plaintiff also brings a Michigan Whistleblowers' Protection Act claim against Saginaw County under MCL § 15.362. Plaintiff alleges that he was retaliated against when he uncovered and reported official corruption. According to the complaint, Plaintiff was demoted when he reported that certain individuals within the Sheriff's Department were misappropriating funds seized in the course of official operations.

Defendants filed a motion for summary judgment on all counts. Both parties agree that the statute of limitations has run on the Whistleblowers' Protection Act claim. Defendants contend that the First Amendment claim fails because, among other reasons, Plaintiff cannot establish that he was speaking as a private citizen instead of a public employee. For reasons set forth below, the issue of whether Plaintiff was speaking as a private citizen is dispositive. As such, the following background facts will focus on that part of the record.

## I. <u>Background</u>

Plaintiff was a Saginaw County Sheriff's Deputy, appointed in 2006. Starting in 2011, he was assigned to work in the property and evidence room. In that role, Plaintiff had the task of logging everything that went in and out of the room. Although the parties' specific accounts vary, the underlying incident Plaintiff reported happened in spring of 2014.

**The Incident**

On February 27, 2014, Detective John Butcher deposited $22,583 and two handguns into the evidence room. (ECF No. 43, PageID.714.) The money and guns were taken from Pierre Najjar, who was under

investigation for selling narcotics. Apparently, Mr. Najjar agreed to give Detective Butcher $22,583 in cash instead of proceeding to civil forfeiture of his vehicle. Plaintiff inventoried this property and alleges Detective Butcher misrepresented the money as evidence, and so Plaintiff did not realize it was civil forfeiture money. (ECF No. 43, PageID.725.)

On March 19, 2014, Detective Butcher requested that Plaintiff "provide him with $2,000 in cash out of the sealed evidence bag." (ECF No. 43-3, PageID.744.) Plaintiff refused the request because he found it improper. (*Id.*) Detective Butcher then went to their superior, Lieutenant Pfau, who intervened and told Plaintiff to provide Detective Butcher with the requested money. (*Id.*) Plaintiff alleges that despite his objections, money was continually removed from the evidence room between 2014 and 2015 until the entire $22,583 had been depleted. (*Id.* at PageID.745.)

**The Reporting**

In January 2016, Plaintiff was asked to compile information for an annual report to the State of Michigan concerning civil forfeiture activities during the 2015 calendar year. (ECF No. 43, PageID.718; ECF No. 35, PageID.235.) The report was typically prepared by an Undersheriff, but the Sheriff asked Plaintiff to prepare the report

because the Undersheriff was out sick that day. (ECF No. 43, PageID.725; ECF No. 35, PageID.235.) Plaintiff had never been asked to prepare the report before. To complete the report, the Sheriff asked Plaintiff to "get financial information . . . needed for the forfeiture reporting that goes to the state." (ECF No. 35-8, PageID.403.) Plaintiff remembers he needed to inventory the cash and report "how much money was brought in over the past year." (*Id.*)

It was in process of preparing this report that Plaintiff says he first realized "the $22,583 was off the books and would neither be accounted for in the County's budget nor the annual report to the State of Michigan." (ECF No.43-3, PageID.745.) Plaintiff did his own research and alleges he learned that the Department's handling of civil forfeiture money was illegal. (ECF No. 43, PageID.718.) He says he also realized that the "scope of the illegality" went up the chain of command and so he reported this "to the County Finance Director in January 2016." (*Id.* at PageID726.) Plaintiff's meeting with the Saginaw County Finance Director took place on January 22, 2016. It is in this meeting that Plaintiff contends he exercised his First Amendment rights as a private citizen "when he communicated about the misappropriated and illegally

used funds" to the Finance Director. (ECF No. 1, PageID.7.) Defendants maintain that this entire interaction was performed within the scope of Plaintiff's employment.

Nowhere in the record does Plaintiff allege that he affirmatively told the Finance Director that there was illegal activity in the Sheriff's Department. Rather, Plaintiff implies that by submitting financial documents and telling the Finance Department that the $22,583 in cash was gone, these actions constituted reporting fraud. At the meeting, Plaintiff testifies he told the Finance Director that the "money that was in that fund had been completely exhausted." (ECF No. 35-4, PageID.376.) He also testifies that he emailed the Finance Director a "spreadsheet with the information I was told to give her." (*Id.*) From the record, this "spreadsheet" appears to be a printed email with additional handwritten entries detailing when Detective Butcher withdrew cash from the property room. (ECF No. 35-5, PageID.383.) Plaintiff recalled that once he told the Finance Director that the money had been "exhausted" that she replied with "oh, my" and "she looked completely alarmed." (ECF No. 35-4, PageID.376–377.)

Regardless of the Finance Director's reaction, Defendants assert that part of Plaintiff's job in compiling the 2015 year-end report was to "meet with and obtain information from the Finance Director." (ECF No. 35, PageID.242.) In his deposition, Plaintiff also agreed that he was asked by the Sheriff to "get some information" to the County Finance Director regarding the year-end report:

> Q. Okay. So you, in addition to what you typically did on an annual basis, also gave this information to [the Finance Department] regarding the year-end report, correct?
>
> A. Fair statement.
>
> Q. And you were directed to [sic] that by the sheriff?
>
> A. Correct.
>
> Q. As part of your duties as the property officer?
>
> A. Correct.

(ECF No. 35-4, PageID.371.) When Plaintiff was asked about his typical tasks, he affirmed that as property officer one of his obligations was to do an inventory of the property room. (*Id.*) He also confirmed that he needed to count the cash in order to know what was in the property room, and this accounting went into the year-end report. (*Id.*) Plaintiff testified that "[t]he cash was mainly what went in the year-end report." (*Id.*)

Defendants contend that "the only new information disclosed by Plaintiff" to the Finance Department "was that the money had now been completely withdrawn," and he did so by emailing the Department "a spreadsheet evidencing each withdrawal by Det. Butcher." (ECF No. 35, PageID.235–236.) Defendants argue that although this spreadsheet was not supposed to be shared directly—given the confidential information it contained about undercover operations—that Plaintiff forwarded the spreadsheet in order to "balance the account." (ECF No. 35, PageID.242–243.) Apparently, there had been a gap in the reporting and accounting process when an employee left the Sheriff's Department in 2014. (*Id.*) When asked about this in his deposition, Plaintiff responded:

> When I was compiling the information the sheriff told me to get together, I realized that 22,000 had been exhausted, completely removed from the property room, and it would not be reflected on the books. So I was thinking to myself like, oh, my gosh. This looks bad. Their books are going to show that there's 22,000 and something dollars in here and it's been taken from the property room by Butcher to pay these individuals. And I was afraid that it would not balance with the prior years [sic] books.

(ECF No. 35-4, PageID.375.) Plaintiff then testified that he "learned at that point that funds taken from forfeiture funds needed to be deposited with the treasurer or, you know, the general municipality at that time"

and "knowing that that didn't happen, I was afraid that being a part of this process, it was going to reflect poorly on me." (*Id.*)

Plaintiff alleges that Sheriff Federspiel disagreed with how the Saginaw County Controller allocated civil forfeiture money and said that he was "going to work around it." (ECF No. 43, PageID720; ECF No.43-12, PageID.861.) Defendants argue that Plaintiff has a "profound misunderstanding of the forfeiture and vehicle buy-back process." (ECF No. 35, PageID. 246.)

Plaintiff points to several instances of retaliation that followed his reporting. He contends that he was put under investigation, transferred from his position in the property room "on false pretenses," verbally reprimanded by the Sheriff, and "re-assigned back to summer roadkill carcass duty." (ECF No. 43, PageID.726–727.) Defendants maintain that none of these instances were retaliatory. Defendants claim that they were "concerned about the amount of information disclosed" because the release of the information threatened undercover DEA operations. (ECF No. 35, PageID.236.) The Sheriff requested an internal investigation to determine how the sensitive information was released. (*Id.*) The Sheriff also had a meeting with Plaintiff to remind him of the importance of

following "the chain of command and the potential detrimental impact of his disclosures on the department." (ECF No. 35, PageID.237.)

## II.   **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   **First Amendment**

The particular speech Plaintiff points to as an exercise of "his First Amendment rights as a private citizen" was "when he communicated about the misappropriated and illegally used funds to the Saginaw County Finance Director." (ECF No. 1, PageID.7.) Plaintiff claims that reporting the illegal actions was not part of his responsibilities in the

Sheriff's office. (*Id.*) Defendants disagree that Plaintiff reported illegal activity and further argue that "Plaintiff was assigned additional duties to meet with and obtain information from the Finance Director" and so any communication with her fell squarely within his official duties. (ECF No. 35, PageID.242.) As explained below, this issue controls the case.

To establish a prima facie case of First Amendment retaliation, Plaintiff must show that: (1) he engaged in constitutionally protected speech or conduct; (2) that his employer took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in that speech; and (3) that a causal connection exists between the protected speech and the adverse employment action. *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018). Plaintiff's First Amendment claim fails because he cannot show that he was engaged in constitutionally protected speech.

The determination of whether a public employee engaged in protected speech is a pure question of law for the courts to decide. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462–64 (6th Cir. 2017). On this point, "[p]ublic employee plaintiffs are required to meet additional standards to establish that the speech at issue is constitutionally

protected." *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). There is a three-step inquiry to determine whether speech by a public employee is constitutionally protected. *Mayhew*, 856 F.3d at 462. Plaintiff must show that (1) he spoke as a private citizen (2) on a matter of public concern, and (3) that the interest of the government employer, in promoting efficient public service, is not outweighed by his interest in that speech. *Id.*

Defendants argue, among other things, that Plaintiff cannot establish prong (1) that he was speaking as a private citizen. For reasons that follow, Plaintiff cannot establish that he was speaking as a "private citizen" when he communicated with the Finance Department about the depleted forfeiture funds. Because this factor is dispositive, the Court need not address the remaining two prongs of the test, nor the *Monell* liability issue raised by Defendants.

**Speech as a Private Citizen**

The Supreme Court in *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). In *Lane*, the Court later clarified that "[t]he

critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Thus the key inquiry here is whether Plaintiff's speech and activity at the meeting with the Finance Director were in furtherance of his ordinary job responsibilities.

This public employee/private citizen distinction is "challenging," and "although the Supreme Court has not identified any detailed analysis to decide this question," the inquiry is meant to be a practical one. *Haddad v. Gregg*, 910 F.3d 237, 247 (6th Cir. 2018) (citing *Mayhew*, 856 F.3d at 464.) The Sixth Circuit has identified several factors including "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007). All of these factors weigh against Plaintiff.

**The Scope of Employment**

The Sixth Circuit has held that "*ad hoc* or *de facto* duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description." *Weisbarth v. Geauga Park*

*Dist.*, 499 F.3d 538, 544 (6th Cir.2007). An *ad hoc*, or on-the-job duty is one that arises in the moment, requiring employees to perform a task that they might not do every day. Plaintiff's supervisor, in this case the Sheriff, asked him to compile the year-end report and provide information about the property room to the Finance Department, which was an *ad hoc* task. The important and controlling fact here is that his speech "owes its existence to [his] professional responsibilities." *Id.* (quoting *Garcetti*, 547 U.S. at 421).

Plaintiff alleges that his communications to the Finance Director "about the misappropriated and illegally used funds" were constitutionally protected speech. (ECF No. 1, PageID.7.) He claims that reporting these illegal actions were "beyond and not part of" Plaintiff's responsibilities in the Sheriff's office. (*Id.*) Defendants argue that any communication Plaintiff made to the Finance Director "arose directly from his obligation to balance the funds on hand in the property room." (ECF No. 35, PageID.242.) Plaintiff agrees that he was required to communicate with the Finance Department as part of making the year-end report, but argues that these duties were not his "usual, regular or ordinary job duties," since the task was typically done by the

Undersheriff who was sick that day. (ECF No. 43, PageID.732.) Regardless of whether these tasks were usually done by someone else, the impetus for the speech was an assignment from the Sheriff.

Plaintiff argues that in *Lane* the Supreme Court changed the previously stark distinction between public and private employees. It is certainly true *Lane* clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240. Rather, the inquiry is about whether the speech was "ordinarily" within the scope of an employee's duties. This distinction does not help Plaintiff, however. In *Lane*, the plaintiff was hired as the director of a statewide program for underprivileged youth, and while conducting an audit, he discovered that a State Representative was on the program's payroll but had not been reporting the money as income. *Id.* at 232. When the state representative refused to perform her job, the plaintiff fired her. *Id.* A federal corruption investigation was initiated, and the plaintiff was called to testify about the firing. *Id.* at 232–33. The plaintiff was later fired and filed a First Amendment suit. *Id.* at 234. The Supreme Court held that the plaintiff's speech was protected even though

the subject matter directly involved his duties as an employee, because the plaintiff was under subpoena to testify, and testifying was not part of his regular job duties. *Id.* at 238.

Here, unlike in *Lane*, Plaintiff was given an assignment by the Sheriff to report to the Finance Director. *Lane* does not differentiate between regular and special job assignments; rather the case clarifies that when information learned within the scope of one's employment is shared in a manner outside the scope of one's employment, that speech might be protected. *Lane*, 573 U.S. at 240. Plaintiff's additional duty of preparing the report may have been a one-time assignment, but it was a job duty nonetheless.

**The Chain of Command**

Plaintiff also points to the Sixth Circuit's recent decision in *Buddenberg*, where the court clarified that, "[s]peech outside the chain of command is less likely to be within an employee's ordinary job responsibilities." *Buddenberg v. Weisdack*, No. 18-3674, 2019 WL 4559349, at *5 (6th Cir. Sep. 20, 2019) (citing *Handy-Clay*, 695 F.3d at 542–43). Here, it is not clear that Plaintiff did speak outside the chain of command in the same manner as the plaintiff did in *Buddenberg*. The

*Buddenberg* plaintiff was a fiscal coordinator and as part of her duties she "processed biweekly payroll, prepared monthly fiscal reports to the Board, processed accounts payable, [] assisted with budget processes," and performed some human-resources functions. *Id.* at *5. While reporting to the Board, the plaintiff also reported an ethical violation and a disparate pay issue. The Sixth Circuit found that the plaintiff's ordinary duties did not include reporting employee misconduct to the Board, which "distinguish[ed] this case from those in which the plaintiff's job functions included overseeing department operations and 'report[ing] any appropriate situations and accidents immediately to management.'" *Id.* (citing *Mayhew*, 856 F.3d at 465).

Plaintiff argues that he went outside the chain of command by telling the Finance Department that the cash was gone from the property room. But unlike in *Buddenberg*, Plaintiff was tasked with telling the Finance Department what was in the property room. Plaintiff confirmed that as property officer his "obligation was to do an inventory of the property room" after which he would meet with the accountant to "go item by item and ensure that all of the cash was there." (ECF No. 35-4, PageID.371.) Even if Plaintiff was not supposed to submit the

16

confidential "spreadsheet" detailing payments, he was asked by the Sheriff to get a report to the Finance Department, and this paper explained the balance of cash in the property room. Plaintiff confirmed he gave this information because he "was afraid that it would not balance with the prior years [sic] books" and that "being a part of this process" would "reflect poorly" on him. (*Id.* at PageID.375.)

This case is more analogous to *Weisbarth v. Geauga Park District*, where the Sixth Circuit found that a plaintiff was not speaking as a private citizen, even though she spoke to someone outside her chain of command. 499 F.3d 538 (6th Cir. 2007). The *Weisbarth* plaintiff, a park ranger, spoke with an independent investigator about her department's operation, and in light of her comments to the investigator she was fired. *Id.* at 540. The Sixth Circuit found that she was not speaking as a private citizen, even though speaking with the investigator was not part of her job description. The park ranger's speech "owe[d] its existence to [her] professional responsibilities." *Id.* at 544 (quoting *Garcetti*, 547 U.S. at 411). Because such activities were conducted "as part of [her] professional responsibilities," she was acting as a public employee and not a citizen. *Id.* (internal citations omitted). So, even though the chain of command is

a factor, the Sixth Circuit has similarly said it "[i]s not where the person to whom the employee communicated fit within the employer's chain of command, but rather whether the employee communicated pursuant to his or her official duties." *Id.* at 545. Plaintiff here communicated with the Finance Department as part of his official duties.

This case is similarly controlled by the Sixth Circuit's decision in *Haddad v. Gregg.* 910 F.3d 237 (6th Cir. 2018). In that case, the court found that an employee's speech and activity—rallying his co-workers and department in an attempt to change what he believed to be an unfair insurance practice—were not undertaken as a private citizen. *Id.* at 240. Because the employee was a market conduct examiner for the department, his speech activity concerned the regulatory issues that he was tasked with dealing with in his employment. *Id.* As such, the court concluded "that Plaintiff's activities were in furtherance of the ordinary responsibilities, so he was not speaking as a private citizen." *Id.* at 249. The Sixth Circuit went on to say that its conclusion "does not ignore that Plaintiff's mission may have been motivated by his perceived public interest purpose. But however laudable, Plaintiff's quest" was taken in his role as an employee. *Id.*

Similarly, here Plaintiff raises important questions regarding how Defendants handled more than $22,000 in cash. His mission may have been motivated by public interest, but he learned of the potentially misappropriated funds while completing an assigned year-end financial report and he communicated this information while delivering this report in the ordinary course of his employment. Plaintiff even testified that he was "requested to compile information for a state-mandated report disclosing all the moneys and property seized by the Sheriff's Office" and that it was while compiling this report that he realized the $22,583 was "misused." (ECF No. 43, PageID725.)

**Conclusion**

Plaintiff's communications to the Finance Department were directly related to a task he was assigned at work, and so his speech was made in his capacity as an employee, not as a private citizen. Plaintiff's job description might not reflect the task of reporting to the Finance Department, but as the Supreme Court said in *Garcetti*, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to

demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." 547 U.S. at 424–25. Plaintiff's First Amendment claim does not survive because he was not engaged in constitutionally protected speech.

## IV. Michigan's Whistleblowers' Protection Act

Defendants move for summary judgment on Count II, the Michigan Whistleblowers' Protection Act claim. Mich. Comp. Laws § 15.361 *et seq*. Defendants argue that the claim is barred by the statute of limitations, and Plaintiff concedes that the statute of limitations "has lapsed" and that the "claim must be dismissed." (ECF No. 43, PageID.739.) Defendants motion for summary judgment on Count II is granted.

## V. Conclusion

Accordingly, Defendants' motion for summary judgement on all counts is **GRANTED**, and this case is dismissed with prejudice.

IT IS SO ORDERED.


Dated: November 1, 2019           s/Judith E. Levy
Ann Arbor, Michigan               JUDITH E. LEVY
                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 1, 2019.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager